**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| UNDERDOG EXCHANGE DCM, INC. and UDM, LLC d/b/a UNDERDOG PREDICT,<br><br>Plaintiffs,<br>v.<br><br>CATHERINE L. HANAWAY, in her official capacity as Attorney General of Missouri; MICHAEL A. LEARA, in his official capacity as Executive Director of the Missouri Gaming Commission; JAN M. ZIMMERMAN, in her official capacity as Chairman of the Missouri Gaming Commission; and KEVIN M. SPAULDING, KEVIN CANTWELL, SAM GLADNEY, and ROGER STOTTLEMYRE, in their official capacities as Commissioners of the Missouri Gaming Commission,<br><br>Defendants. | : | Case No.: _______________ |

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Underdog Exchange DCM, Inc. and UDM, LLC d/b/a Underdog Predict ("Underdog"), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege as follows:

## INTRODUCTION

1. This action seeks to prevent the Attorney General of Missouri ("Attorney General"), the Executive Director ("Executive Director") of the Missouri Gaming Commission ("Gaming Commission"), and the Chairman and Commissioners of the Gaming Commission

(collectively, "Defendants") from unlawfully exercising jurisdiction over, regulating, or terminating Underdog's offering of lawful derivatives contracts on federally regulated markets.

2. Underdog operates a federally regulated designated contract market ("DCM") that lists event contracts for trading in interstate commerce. Underdog is also a federally registered futures commission merchant ("FCM") that solicits or accepts orders for the purchase or sale of event contracts traded on other DCMs. Through the Commodity Exchange Act ("CEA"), Congress vested the U.S. Commodity Futures Trading Commission ("CFTC") with sole regulatory authority over event contracts and other derivatives traded on designated contract markets, including deciding whether to prohibit certain event contracts—such as contracts related to gaming—as contrary (or not) to the public interest. 7 U.S.C. § 7a-2(c)(5)(C). According to the CEA and CFTC, "event contracts" are derivatives or swaps whose returns are "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency."[1]

3. Pursuant to its DCM and FCM designations, Underdog offers event contracts in Missouri. Since the CFTC has "exclusive jurisdiction" to regulate trading on DCMs, including through FCMs, under the CEA, 7 U.S.C. §§ 1 *et seq.*, Underdog's compliance with CFTC approval procedures authorizes Underdog to offer and facilitate the trading of event contracts in Missouri.

4. Nevertheless, Underdog now faces the imminent threat that Defendants will try to apply Missouri's gambling and sports wagering laws against Underdog's federally regulated markets. Indeed, on September 17, 2026, the Attorney General issued a cease-and-desist letter to Underdog. The letter asserts that Underdog "is offering sports wagering to individuals located in the State of Missouri, despite not submitting to regulation by the Missouri Gaming Commission

---

[1] *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane. *Id.*

as required by Missouri law," gives Underdog "two options"—"cease and desist from such activity" or "obtain a license from the Missouri Gaming Commission"—and warns that "[i]f Underdog persists in violating Missouri law, the State of Missouri will pursue available enforcement actions against Underdog." *See* Letter from Louis J. Capozzi, III, Solicitor Gen., Mo. Att'y Gen.'s Office, to Underdog Sports Wagering, LLC at 1 (Sept. 17, 2026), attached hereto as Exhibit 1 ("Underdog C&D"). The same day, the Attorney General issued cease-and-desist letters to five other prediction markets operating in Missouri, including Polymarket, Kalshi, OG, Novig, and Robinhood, stating that if they do not submit to Missouri's gaming laws and its wagering tax, her office will sue.[2]

5. Underdog, like the other DCMs and FCMs that received cease-and-desist letters, is regulated by the CFTC. The Attorney General asserts that, notwithstanding that the CFTC has exclusive jurisdiction to regulate DCMs and FCMs, Underdog is an "online sports wagering platform" that must obtain a license from the Gaming Commission. Underdog C&D at 1-2. The Attorney General's letter gives Underdog thirty days[3] to "confirm Underdog's compliance with Missouri law or its cessation of sports wagering activities in the State of Missouri," failing which "the State of Missouri will take legal action against Underdog." Ex. 1, Underdog C&D at 3. On November 6, 2026, the Attorney General's office notified Underdog that the State intends to commence enforcement proceedings against Underdog within three days. *See infra* ¶ 74. Underdog therefore faces a real and imminent risk of attempted enforcement, exposing it to civil

---

[2] Blake Schowalter, *Missouri Attorney General Sends Cease-and-Desist to Prediction Market Companies*, KFVS12 (Sept. 17, 2026), https://www.kfvs12.com/2026/09/17/missouri-attorney-general-sends-cease-and-desist-prediction-market-companies/ (hereinafter "September 17 Report").

[3] On October 15, 2026, the Attorney General extended the Underdog C&D's compliance deadline until October 30, 2026. *See* Letter from Louis J. Capozzi, III, Solicitor Gen., Mo. Att'y Gen.'s Office, to Underdog Sports Wagering, LLC (Oct. 15, 2026) attached hereto as Exhibit 2 ("Underdog Extension Letter").

penalties, potential criminal liability, forced cessation of operations in Missouri, and severe collateral consequences to its nationwide operations.

6. Any enforcement action by Missouri would be meritless. Defendants' attempt to apply and enforce Missouri's law is plainly inconsistent with Article VI, Clause 2, of the United States Constitution ("Supremacy Clause") and any enforcement efforts are therefore preempted. The CFTC has also confirmed its position that states' attempted enforcement of their laws against CFTC-designated contract markets violates the Supremacy Clause in each of the amicus briefs, motions to intervene, emergency orders, and nine litigations it has filed across the country enforcing the CFTC's exclusive jurisdiction over derivatives trading on DCMs. *See infra* ¶¶ 61-66.

7. Congress was explicit with its intent in enacting the CEA and giving the CFTC exclusive jurisdiction: because derivatives transactions are "affected with a national public interest," it was essential to create "a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [CFTC]." 7 U.S.C. § 5. Accordingly, federal courts have long recognized that the CFTC's regulation of the national derivatives market is exclusive and preempts state involvement.[4] As the Third Circuit

---

[4] *See, e.g.*, *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003) (finding the CEA preempted California's Bucket Shop Law as applied to swaps exempted from coverage by the CEA); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 560, 563-64 (6th Cir. 1998) (noting that "[f]utures trading is conducted on exchanges designated as contract markets by the [CFTC], an independent agency created by Congress in 1974 to exercise *exclusive jurisdiction* over accounts, agreements, and transactions involving commodities futures contracts traded or executed on a contract market" and holding that a CEA regulation conflict preempted an Ohio statute that required payment to investors of any interest earned on collateral because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA" (emphasis added)); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992) (holding the CEA preempted state law whose application "would directly affect trading on or the operation of a futures market"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (holding CEA "preempts the application of state law" to futures trading); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (affirming dismissal of a claim that trading in futures contracts violated Georgia gambling statute "on the ground that the Commodity Exchange Act preempts all state laws inconsistent with its provisions"); *DGM Invs., Inc. v. N.Y.*

recently recognized, "the text of the Act preempts otherwise applicable state laws that purport to regulate . . . event contracts on CFTC-licensed [contract markets]." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

8. Consistent with Congress's original purpose, each amendment to the CEA over the past century has only reinforced its intent to maintain a uniform system. For instance, Congress expanded the CFTC's exclusive authority to cover new products, including swaps and contracts on "excluded commodities," authorized the CFTC to review and prohibit certain event contracts if it determines that their trading would be contrary to "the public interest," and gave the CFTC authority to further define "swap." 7 U.S.C. § 7a-2(c)(5)(C); 15 U.S.C. § 8302(d)(1). Consistent with its role, the CFTC has issued copious guidance regarding when an event contract may be suspended and what kinds of transactions classify as "swaps." On October 9, 2026, the CFTC exercised its authority by issuing a Notice of Proposed Rulemaking providing that the term "swap" includes "[e]vent contracts, including those based on sports-, politics-, cultural, and weather-related events." Further Definition of "Swap"—Inclusions, 91 Fed. Reg. 66,022, 66,029 (published on Oct. 19, 2026) (to be codified at 17 C.F.R. pt. 1) (hereinafter "Inclusion NPRM"). That same day, the CFTC also issued an interim final rule—which is now in effect—excluding "[c]asino-style gambling products" from the definition of swap. Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969 (published on Oct. 19, 2026) (interim final rule) (to be codified at 17 C.F.R. pt. 1) (hereinafter "Exclusion IFR"). Most recently, on November 5, 2026, the CFTC reaffirmed its commitment to maintaining a uniform market by

*Futures Exch., Inc.*, No. 01 CIV. 11602(RWS), 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) (dismissing state law claims as preempted by the CEA because they "would directly affect 'trading on or the operation of a futures market'" (citation omitted)).

issuing an interpretation regarding impartial access requirements that directs DCMs to provide open and fair access to members no matter where they reside nationwide.

9. Underdog thus seeks declaratory and injunctive relief to protect its ability to operate federally regulated markets in Missouri. Any attempt by Missouri to regulate trading on DCMs (including through FCMs) is expressly preempted. Congress grants the CFTC "exclusive jurisdiction" to regulate trading on DCMs, including of options and "transactions involving swaps," such as event contracts. 7 U.S.C. § 2(a)(1)(A).

10. Missouri's regulation of trading on DCMs (including through FCMs) is also preempted because Congress has fully occupied the field of regulating federally registered DCMs, thereby preempting any overlapping state laws including state licensing or registration conditions that Missouri might purport to apply to Underdog.

11. Lastly, Missouri's regulation of trading on DCMs (including through FCMs) that would require Underdog to cease offering federally authorized event contracts is additionally preempted because it directly conflicts with the CEA's framework. Underdog cannot comply with both its federal law obligations and any purported obligations under Missouri law. Moreover, ceasing operations in Missouri would, among other things, undermine the CEA's goals of creating a uniform system of derivatives trading and violate CFTC guidance intended to promote uniform and fair markets. Indeed, it would cause the exact harm the CEA sought to prevent: traders could open a position outside of Missouri, travel to Missouri, and, while there, lose the ability to close or expand their existing position due to Missouri's application of its gaming regulations.

12. The threat of Defendants' attempted enforcement of Missouri law poses a direct and imminent threat to Underdog's business and its users, and leaves Underdog with a "Hobson's choice" wherein both its options will cause irreparable harm. *Morales v. Trans World Airlines*,

*Inc*., 504 U.S. 374, 381 (1992). Either Underdog can continue to operate in Missouri, "expos[ing] [itself] to potentially huge liability," including civil and criminal penalties, reputational damage, and competitive disadvantage, or it can "suffer the injury of obeying [Missouri's] law" despite the fact that it is preempted. *Id.*

13. In light of the imminent threat it faces as a result of Defendants' intention to wrongfully enforce Missouri law, Underdog brings this action to protect its right to offer event contracts pursuant to federal law and regulation, maintain the integrity of the federal regulatory framework, and avert imminent harm to its business operations.

## **JURISDICTION AND VENUE**

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution and the laws of the United States—specifically, whether Missouri law is preempted by the CEA as applied to Underdog's event contracts. And the Court has the power to declare the rights and legal relations of the parties under the Declaratory Judgment Act, 28 U.S.C. § 2201.

15. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. Underdog's event contracts are offered to, and traded by, persons throughout Missouri, including in this District, and Defendants' attempted enforcement of Missouri's gambling and sports wagering laws against those contracts reaches and affects every such transaction. Venue is likewise proper in this Division, and at this divisional office, pursuant to W.D. Mo. L.R. 3.2(b)(2), as Underdog's event contracts are offered to, and traded by, persons residing in the counties served by this divisional office, and the threatened enforcement described below reaches each such transaction.

16. The Eleventh Amendment does not bar this action. Underdog sues only state officials, in their official capacities, for prospective declaratory and injunctive relief to halt the threatened enforcement of state law that violates federal law. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002); *Mo. Prot. & Advoc. Servs., Inc. v. Carnahan,* 499 F.3d 803, 807 (8th Cir. 2007) (Eleventh Amendment does not bar a suit to enjoin a state official who has some connection with the enforcement of an allegedly unconstitutional statute).

## **PARTIES**

17. Plaintiff Underdog Exchange DCM, Inc. is a Delaware corporation headquartered in Brooklyn, New York. It operates a DCM regulated by the CFTC under the CEA, where users can trade financial products, including event contracts.

18. Plaintiff UDM, LLC, doing business as Underdog Predict, is a Delaware limited liability company headquartered in Brooklyn, New York. It is an FCM regulated by the National Futures Association ("NFA") and the CFTC under the CEA, offering event contracts traded on other CFTC-registered DCMs.

19. Defendant Catherine L. Hanaway is the Attorney General of Missouri and is sued in her official capacity. The Attorney General "shall institute, in the name and on the behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state . . . ." Mo. Rev. Stat. § 27.060.

20. Defendant Michael A. Leara is the Executive Director of the Missouri Gaming Commission and is sued in his official capacity.

21. Defendant Jan M. Zimmerman is the Chairman of the Missouri Gaming Commission, and Defendants Kevin M. Spaulding, Kevin Cantwell, Sam Gladney, and Roger Stottlemyre are its Commissioners. Each is sued in his or her official capacity.

22. Together, Defendants Attorney General Catherine L. Hanaway, Michael A. Leara, Jan M. Zimmerman, Kevin M. Spaulding, Kevin Cantwell, Sam Gladney, and Roger Stottlemyre would be responsible for enforcing the Missouri laws that are preempted by federal law. The Attorney General has threatened to exercise that enforcement authority against Underdog and CFTC-regulated markets similarly situated to Underdog. *See infra* § I.

## FACTUAL ALLEGATIONS

### A. Underdog Operates Federally Registered Marketplaces For Trading Event Contracts.

23. Underdog operates a federally regulated DCM that provides a marketplace for trading in derivatives products, including event contracts. Underdog is also a federally regulated FCM that allows traders to use its platform to trade event contracts listed on other CFTC-registered DCMs.

24. Underdog registered its FCM with the NFA and CFTC on January 9, 2026, confirming that its platform complied with the CEA. As an FCM, Underdog began offering event contracts in Missouri on March 19, 2026.

25. The CFTC granted Aristotle Exchange DCM, Inc. its DCM designation on September 5, 2025, confirming that its market complied with the CEA. In March 2026, Underdog acquired Aristotle Exchange DCM, Inc. and its associated Derivatives Clearing Organization.

Underdog announced the launch of its DCM on July 18, 2026.[5] On August 31, 2026, Aristotle Exchange DCM, Inc. filed a name change and is now named Underdog Exchange DCM, Inc.

26. Pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. § 40.2(a), (d), Underdog has obtained CFTC certification for hundreds of event contracts.

27. On July 17, 2026, pursuant to its DCM designation, Underdog began offering its event contract listings to traders located in Missouri.

### B. Congress Intentionally Vested the CFTC With Comprehensive and Exclusive Jurisdiction to Regulate Derivatives—Including Event Contracts—on Federally Registered Markets.

28. Derivatives are financial instruments used to allocate risk between counterparties. A derivative takes its value from something else—an asset, a rate, or a variable known as the underlier. The classic example is the grain futures contract, which permits buyers to mitigate the risk of volatility in agricultural markets by agreeing to buy or sell a specified amount of the crop at a fixed price on a future date. However, the underlier of a derivative can vary widely, allowing market participants to hedge against volatility across a wide array of tangible and intangible areas, including commodities like gold, financial benchmarks such as interest rates, and even weather or credit risk. Indeed, almost any type of risk can be hedged, as long as a CFTC-regulated market exists and a contract is available.

29. States have long viewed futures contracts with suspicion, equating trading on uncertain outcomes with gambling. Over a century ago, before the federal government began regulating derivatives markets, several states enacted outright bans on futures trading or subjected it to onerous restrictions under their gaming statutes. The resulting patchwork of often conflicting

[5] Underdog Launches Prediction Markets on its own Exchange, Underdog (July 18, 2026), https://www.underdogsports.com/news/underdog-launches-prediction-markets-on-its-own-exchange.

state regulation, poorly suited to facilitating a uniform national financial market, prompted Congress to take action.

30. First, Congress passed the 1922 Grain Futures Act, which required futures transactions for grain to be conducted on contract markets designated by the Secretary of Agriculture, centralizing trading on grain. Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998, 1000 (1922).

31. Then, in 1936, Congress strengthened this federal scheme by enacting the CEA. The CEA established a uniform federal framework for regulating futures markets, extended federal authority to a broader class of commodities and created the Commodity Exchange Authority, a division within the Department of Agriculture charged with monitoring trading practices and prosecuting price manipulation. However, Congress did not yet establish an independent federal agency to comprehensively regulate the nation's derivatives markets. It also did not completely foreclose the application of state law, clarifying in the statute itself that the federal law would not impair the enforcement of applicable state laws. Commodity Exchange Act, Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936).

32. As derivatives markets became more sophisticated and integral to the national economy, Congress worried that, absent a single national regulator, "states . . . might step in to regulate the futures markets themselves," subjecting national exchanges to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156; *see also Leist*, 638 F.2d at 322 ("The federal government has been vitally concerned with trading in futures since 1922; indeed, the courts have held that § 2(a)(1) of the CEA preempts the application of state law."); *DGM Invs.*, 2002 WL 31356362, at *4 ("'Congress' intent to bring the markets under a uniform set of regulations' followed from a fear that states might attempt to regulate futures markets themselves and thus

‘subject the national futures trading apparatus to conflicting regulatory demands.’” (citation omitted)); *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974) (hereinafter “Senate Hearings”) (“different State laws would just lead to total chaos” (statement of Sen. Clark)). Similarly, the House Agriculture Committee stressed the need to bring “all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned.” H.R. Rep. No. 93-975, at 85 (1974).

33. Accordingly, in 1974, Congress enacted sweeping amendments to the CEA (the “1974 Act”) and established the CFTC as an independent federal agency charged with regulating the national derivatives markets. To address the threat posed by conflicting state regulation, Congress added a provision expressly granting the CFTC “exclusive jurisdiction” over derivatives trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). Congress also *eliminated* the 1936 provision providing that the CEA did not supersede or limit state jurisdiction “in order to assure that [f]ederal preemption [was] complete.” 120 Cong. Rec. 30,464 (1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

34. In subsequent amendments to the CEA, Congress continued to reinforce the importance of exclusive federal control over derivatives markets through a single agency—the CFTC. For instance, the 1992 Futures Trading Practices Act (“FTPA”) expanded the CFTC’s regulatory authority by permitting the CFTC to exempt certain financial instruments from the requirement that they be traded on a registered exchange. *See* 7 U.S.C. § 6(c). Congress also brought any such exempt financial instruments within the scope of the CFTC’s exclusive authority by supplementing the existing express preemption provision, *id.* § 2, with a provision explicitly preempting “any State or local law that prohibits or regulates gaming” with respect to any

agreement, contract, or transaction exempted from the exchange-trading requirement. *Id.* § 16(e)(2).

35. Similarly, in 2010, Congress amended the CEA through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"). Once again, Congress expanded the CFTC's exclusive jurisdiction over derivatives markets. Congress added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction, *see id.* § 2(a)(1)(A), and expressly delegated authority to the CFTC and SEC to "further define" swaps as needed. 15 U.S.C. § 8302(d)(1). Congress also established a "Special Rule" expressly granting the CFTC discretionary authority to determine whether specific event contracts, including those that reference terrorism, assassination, war, gaming, activity that is unlawful under federal or state law, or another similar activity, are "contrary to the public interest" and, if so, to prohibit them from trading on DCMs. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a). The Special Rule explicitly contemplated CFTC regulation of sports-related event contracts by giving the CFTC authority to prohibit event contracts related to "gaming" if those contracts are contrary to the public interest. The Rule does not require the CFTC to disallow event contracts referencing these underlying activities, but rather grants the agency the discretion to conduct a public interest review based on its own criteria.

36. Each iteration of the CEA has only reinforced Congress' intention to create a national market for derivatives products *despite* the concerns of individual states that derivatives markets should have remained under state control. Congress created a federal agency, vested it with exclusive jurisdiction, and centralized regulation over derivatives markets, granting the CFTC authority both to certify and prohibit derivatives products.

### C. The CEA and CFTC Regulations Establish a Comprehensive Federal Regulatory and Enforcement Framework for Trading Event Contracts.

37. As a result of the CEA, the federal regulatory scheme governing the trading of derivatives, including event contracts, on DCMs and through FCMs is comprehensive and well-established.

38. To offer its derivatives for public trading, an entity must first be designated a contract market, or a DCM, by the CFTC. *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The designation process is rigorous and requires the applicant to demonstrate compliance with the CEA's Core Principles as set out by the CFTC. *See* 17 C.F.R. § 38.3(a)(2); 7 U.S.C. § 7(d); *infra* § J.

39. Among other things, this requires the applicant to show it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. *See* 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

40. Once approved and granted designation, a DCM becomes subject to an expansive regulatory framework administered by the CFTC. DCMs have extensive continuing federal obligations, including prescriptive capital and liquidity requirements, participant eligibility standards, reporting obligations, recordkeeping mandates, and operational and governance standards—all directed toward compliance with the CEA's Core Principles. *See* 17 C.F.R. §§ 38.1101, 38.604, 38.1051(i), 38.950, 1.31, 38.450, 38.451; 7 U.S.C. § 7(d); *see generally* 17 C.F.R. pt. 38.

41. Because of the breadth and rigor of this regulatory framework, a DCM earning the CFTC's designation is accorded the status of a self-regulatory organization under federal law. DCMs are entrusted with front-line enforcement responsibilities, including establishing and enforcing market rules, detecting and preventing market abuses, and ensuring the integrity of all listed products and intermediaries. *See* 17 C.F.R. § 1.3; *id.* pt. 38.

42. In addition to its regulatory oversight authority, the CFTC possesses exclusive and comprehensive enforcement powers with respect to DCMs, their intermediaries, and market participants.

43. The CFTC's Division of Enforcement may initiate investigations and, with the approval of a majority of the Commission, bring enforcement actions in federal court or through administrative proceedings. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3. If the Division determines that a violation of the CEA has occurred, the CFTC may pursue civil monetary penalties, restitution, disgorgement, injunctive relief, cease-and-desist orders, and the suspension or revocation of registration and trading privileges. Criminal violations may be referred to the Department of Justice. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3.

44. Just like DCMs, FCMs are subject to comprehensive CFTC regulation. The CEA defines an FCM as "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(28). FCMs are required to register with the CFTC, *id.* § 6f; 17 C.F.R. § 3.10(c), and to comply with

reporting requirements to the CFTC, *id.* §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id.* § 1.55, minimum financial requirements, *id.* §§ 1.12, 1.17, and recordkeeping requirements, *id.* §§ 1.14, 1.18. They must also "establish, maintain, and enforce" a risk management program and adhere to related reporting requirements. *Id.* §§ 1.11(c)(1), 1.15. Finally, FCMs must establish internal procedures to ensure compliance with trading standards, *id.* § 155.3, and adopt written policies and procedures to ensure compliance with conflict of interest regulations, *id.* § 1.71.

**D. Event Contracts Are Swaps Under the CEA.**

45. DCMs list event contracts for trading in interstate commerce. Event contracts are exchange-traded financial instruments, known as derivatives or swaps, and are defined broadly under the CEA as relating to any "occurrence, extent of an occurrence, or contingency," 7 U.S.C. § 7a-2(c)(5)(C)(i), that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *See id.* § 1a(47) (defining "swap"); *id.* § 1a(19)(iv); *see also Flaherty*, 172 F.4th at 226 ("'[S]wap' includes event contracts.").[6] FCMs can serve as an intermediary for trading swaps on DCMs.

46. The CEA defines "swap" broadly to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). It additionally includes as swaps any instrument "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

[6] Events themselves are an excluded commodity under the CEA. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

47. "[Event] contracts are not novel innovations." Brief for CFTC as Amicus Curiae Supporting Plaintiff at 7, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31. Since 1992, CFTC-registered exchanges have been listing derivatives with payouts based on events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." *Id.* (quoting 73 Fed. Reg. 25669, 25671 (May 7, 2008)).

**E. Event Contracts Have Price Discovery Benefits, Predictive Value and Allow Businesses to Hedge Risk.**

48. FCMs and DCM operators offering event contracts provide a neutral marketplace by matching counterparties to each other. They are not bookmakers. Unlike a casino, they do not set odds, assume directional risk, or take positions against their customers. Instead, they maintain a transparent marketplace with prices that reflect the supply and demand of a given position in real time.

49. Event contracts typically have a binary payoff structure dependent on the occurrence or non-occurrence of an event or contingency, represented by "yes" or "no" positions. A trader who takes an event contract with the "yes" position profits if the specified event or contingency occurs, while the "no" position purchaser profits if it does not. An active position may also be closed at a profit or loss prior to the occurrence or non-occurrence of the specified event or contingency.

50. The price of an event contract is determined by market forces, namely the supply and demand for entering into the "yes" and "no" positions of the contract. An event contract has a set expiration date, and the price of an event contract will fluctuate along with the market's perception of the likelihood of an event's occurrence until settling at a final price on the expiration

date. Accordingly, event contracts have enormous predictive value because their price is set based on the market's aggregated expectations about whether the underlying event will occur.

51. Event contracts are not traditional gambling. There are several fundamental features that distinguish event contracts from gambling:

a. Counterparty: DCMs and FCMs are not a counterparty to or trader in their event contracts; rather, they facilitate a neutral market for trading among market participants. By contrast, with gambling, the house/bookmaker is the counterparty to the transaction.

b. Revenue model: DCMs and FCMs charge a per-contract transaction fee, and their revenue is not dependent on the outcome of the contract. By contrast, with gambling, the house profits only when customers lose.

c. Price discovery: The prices of event contracts are set in real time by supply and demand among market participants, and market participants can hedge exposure to events on which the contract is based. With gambling, odds are set solely by the house or sportsbook.

d. Purchaser: Businesses, not just individuals, can purchase and trade event contracts. With gambling, only natural persons can place bets.

e. Payout structure: Event contracts are based on a fixed notional value where settlement turns on whether the specified contingency occurs. With gambling, payout is determined by house-set odds at the time of the bet.

f. Tradability: Positions in event contracts can be bought, sold, and re-traded before expiration, and prices fluctuate with market perceptions. With gambling, bets are generally not transferable or revisable once placed.

52. Event contracts also allow businesses to hedge the risks associated with the occurrence or non-occurrence of a particular event, and thus act as a valuable risk management tool. For instance, sports-related event contracts can be used to hedge risk in many scenarios, including:

a. Media, broadcasting, and event ticketing companies facing financial exposure tied to viewership, which can fluctuate significantly depending whether there is a work stoppage or labor strike in a given sport, how competitive or interesting a game is, or how well a given team or franchise is playing;

b. Retailers selling team merchandise or apparel who see major swings in sales depending on whether a popular team advances or a particular player wins;

c. Travel and hospitality businesses exposed to spikes and falls in bookings dependent on whether a local team advances or hosts an event;

d. Restaurants and bars located around major arenas serving drastically different numbers of customers depending on whether a major event occurs,[7] or whether additional games in the NBA finals are played in a particular arena;

e. Advertising and marketing agencies with client campaigns tied to event outcomes, including guaranteed audience metrics, sponsor-activation thresholds, or promotional triggers linked to competition results;

f. Businesses running promotions tied to game results; and

[7] *See, e.g.*, Devin Gannon, *NYPD Closes Area Around MSG for Knicks Game*, 6sqft N.Y.C. (June 10, 2026), https://www.6sqft.com/nypd-closes-area-around-msg-for-knicks-game; Charlie McKenna, *Boston PD to Shut Down Area Around TD Garden During Celtics NBA Finals Game*, Mass Live (June 17, 2024), https://www.masslive.com/news/2024/06/boston-pd-to-shut-down-area-around-td-garden-during-celtics-nba-finals-game.html.

g. Fantasy sports platforms and sports data providers relying on fan engagement and player performance.

53. This is not speculative. Companies such as Game Point Capital have already "arranged millions of dollars' worth of hedges through Kalshi."[8] Similarly, industry commentary has highlighted that event contracts will allow "small businesses that outright *depend on* a full 162-game MLB regular season schedule each year" to hedge their risks during a potential Major League Baseball ("MLB") lockout in 2027.[9] Indeed, these businesses can use Underdog to trade "yes" or "no" on an event contract regarding whether the MLB will have a "New [Collective Bargaining Agreement] Before Dec 2nd, 2026," i.e., whether a lockout will occur, and on an event contract regarding whether the "First Game of the 2027 MLB Regular Season [will commence] Before March 25, 2027." Without the ability to hedge such risks using event contracts, "[l]ocal bars, food vendors, parking lots, souvenir shops, and even ticket scalpers could see their revenues catastrophically slide if the MLB regular season is canceled or shortened due to stalled negotiations."[10]

54. The viability of event contracts' hedging function depends on the efficiency of the markets and thus relies on speculation. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,

---

[8] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (June 17, 2026), https://www.nytimes.com/2026/06/17/business/dealbook/hedging-prediction-markets-kalshi.html; Tarek Mansour (@mansourtarek_), X (Feb. 12, 2026, 3:38 P.M.), https://x.com/mansourtarek_/status/2022047766445535538?lang=en.

[9] *See* David Huber, Prediction Market Hedging Could Become Mainstream During 2027 MLB Negotiations, Deadspin (Aug. 7, 2026), https://deadspin.com/prediction-markets/legal-news/prediction-market-hedging-could-become-mainstream-during-2027-mlb-negotiations/ (emphasis in original); *see also* Joe Peta (@MagicRatSF), X (Aug. 5, 2026, 12:59 A.M.), https://x.com/MagicRatSF/status/2084866766732423467?s=46 (noting the extremity of the "binary economic impact for dozens of cities, hundreds of business and thousands of people" the outcome of Kalshi's market for how many MLB games will be played next season has, such that "[w]e should be cheering @Kalshi for its existence").

[10] *Id.*

456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").

55. As the CFTC has explained, "[i]n addition to their information aggregation, price discovery, and price dissemination functions, prediction markets allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists" such as "sporting events . . . that generate billions of dollars in economic activity and materially affect both regional and national markets." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 at 35,807-08 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

**F. The CFTC Has Exclusive and Discretionary Authority to Permit or Prohibit Event Contracts.**

56. A registered DCM is permitted to list new derivatives contracts—including event contracts—for trading without obtaining the CFTC's prior approval of each individual contract. Instead, the DCM must certify to the CFTC that each new contract complies with applicable regulatory standards by filing a written certification prior to listing. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC then has a period of time to review and object to the submission before listing. If it fails to act during that period, the contract is deemed "effective" and may be listed for trading. *See* 7 U.S.C. § 7a-2(c). The CFTC may also conduct a discretionary review after the contract has been listed.

57. Under the CEA's "Special Rule," Congress expressly granted the CFTC discretionary authority to prohibit trading on specific event contracts, including those that reference gaming, if they are "contrary to the public interest." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Congress did not authorize states to override or nullify federal authorization of event contracts by

deeming them unlawful under state gambling law. *See* 17 C.F.R. § 40.11; 7 U.S.C. § 7a-2(c)(5)(C).

58. The CFTC has established procedures by which it may determine whether trading in a specific contract should be suspended and retains authority to initiate a formal review of any submitted contract under its own rules. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §§ 40.2, 40.11. This includes a 90-day discretionary review period, during which the CFTC may determine a contract is contrary to the public interest and order the DCM to suspend its trading. *See* 17 C.F.R. § 40.11(c). This mechanism ensures continued federal oversight while permitting market innovation to proceed without pre-approval delays for each new product.

59. On June 10, 2026, the CFTC issued a Notice of Proposed Rulemaking, proposing amendments to this discretionary review process. The proposed rule defines "gaming" and imposes three conditions that must occur before a contract may be deemed contrary to the public interest. *See* CFTC Release No. 9249-26. First, the agreements, contracts, transactions, or swaps must be based upon the occurrence, extent of an occurrence, or contingency. *Id.* Second, the agreements, contracts, transactions, or swaps must "involve" any of the enumerated activities (gaming, war, terrorism, assassination, and activities illegal under state and federal law). *Id.* Third, the CFTC must affirmatively determine that the agreements, contracts, transactions, or swaps are contrary to the public interest. *Id.*

### G. The CEA and the CFTC Have Confirmed the CFTC's Exclusive Authority Over Event Contracts Traded On DCMs and Through FCMs.

60. To ensure uniformity in event contract markets and preserve the accuracy of event contract pricing, Congress granted the CFTC exclusive authority to regulate event contracts listed on DCMs and FCMs, including the event contracts Underdog offers directly and as an intermediary, as a subcategory of derivatives. *See* 7 U.S.C. § 1a(47)(A)(ii), (iv), (vi); *supra* § B.

Indeed, "event contracts" are specifically addressed in the CEA and in the Special Rule of the 2010 Dodd-Frank Act. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 7 U.S.C. § 1a(19)(iv).

61. The CFTC has further confirmed its exclusive authority to regulate event contracts listed on DCMs and FCMs through litigation. The CFTC has brought actions against the states and state regulators in nine states, alleging that federal law preempts state law regulating event contracts traded on federally regulated markets. *See United States & CFTC v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026); *United States & CFTC v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States & CFTC v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States & CFTC v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026); *United States & CFTC v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States & CFTC v. Minnesota*, No. 0:26-cv-02661 (D. Minn. May 19, 2026); *United States & CFTC v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026); *United States & CFTC v. Kentucky*, No. 3:26-cv-00049 (E.D. Ky. June 23, 2026); *United States & CFTC v. Utah*, No. 2:26-cv-01055 (D. Utah Oct. 26, 2026). Additionally, the CFTC successfully moved to intervene in a lawsuit brought by Kalshi against state regulators in Rhode Island. *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026), ECF No. 19. The CFTC has also submitted briefs as an amicus curiae in Michigan, Nevada, Ohio, Tennessee, and Utah. Brief for CFTC as Amicus Curiae Supporting Plaintiff, *N. Am. Derivatives Exch. Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), ECF No. 38; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *Kalshiex, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), ECF No. 31; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC v. Orgel*, No. 26-5235 (6th Cir. June 24, 2026), ECF No. 63; Brief for CFTC as Amicus Curiae Supporting Plaintiff, QCX, LLC v. Nessel, No. 26-1552 (6th Cir. Aug. 24, 2026),

ECF No. 20; Brief for CFTC as Amicus Curiae Supporting Plaintiff-Appellant, *KalshiEX LLC v. Cox*, No. 26-4100 (10th Cir. Sept. 28, 2026), ECF No. 34.

62. The CFTC has also issued several notices, including Release No. 9194-26 (Mar. 12, 2026) and Prediction Markets Advisory (CFTC Letter No. 26-08), explaining that event contracts are "swaps" under the CEA. The CFTC's June 10, 2026 Notice of Proposed Rulemaking, Release No. 9249-26, once again confirmed that "Congress vested the Commission with 'exclusive jurisdiction' over 'transactions involving swaps'" and that event contracts are swaps. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 at 35,808-11 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

63. On October 9, 2026, exercising the authority Congress expressly delegated to it to "further define" the term "swap," 15 U.S.C. § 8302(d)(1), the CFTC proposed a rule providing that the term "swap" includes "[e]vent contracts, including those based on sports-, politics-, cultural, and weather-related events." Inclusion NPRM, 91 Fed. Reg. at 66,029. The CFTC explained that "[f]or decades, the CFTC's position has been that event contracts are derivatives subject to its jurisdiction" and that "the best reading of the statute" is that event contracts based on sporting events "qualify as swaps." *Id.* at 66,024-25.

64. The same day, October 9, 2026, the CFTC issued an interim final rule, effective October 19, 2026, upon its publication in the Federal Register, that excludes from the definition of swap "[c]asino-style gambling products," i.e., wagers accepted by a state- or tribally-licensed gaming operator "acting within the scope of that license" that are "not traded on a board of trade, an organized exchange, a swap execution facility, or any other market in which trades are executed multilaterally." Exclusion IFR, 91 Fed. Reg. at 65,976. Gambling products, the CFTC explained, "are typically conducted as bilateral transactions between a casino or bookkeeper (a 'house') and

its customer rather than on an organized market," at prices "unilaterally dictated by the casino or sportsbook." *Id.* at 65,971-72. They use prices that "are not set by market forces and are not subject to negotiation; rather, customers must accept the price set by the house." *Id.* at 65,971. And "gambling products are not inherently *tradeable*" which distinguishes them from "derivative[s] within the Commission's jurisdiction." *Id.*

65. Event contracts, by contrast, "are traded on CFTC-registered national exchanges at market-set prices through the interaction of bids or offers placed on a central orderbook, not at prices unilaterally dictated by a 'house,'" on exchanges that "are neutral" and "do not profit when the event contract settles one way versus another," and "are centrally cleared by CFTC-registered clearinghouses to eliminate counterparty credit risk, just like other derivatives transactions." *Id.* at 65,972. As such, the rule expressly includes contracts "entered into on a trading facility, including a DCM" in the definition of swap, because such a contract's "price and other economic terms would be determined through the competitive interaction of multiple buyers and sellers on a multilateral basis." *Id.* at 65,973.

66. The rule therefore corrects the "erroneous premise that if event contracts are swaps, then casino-style gambling products must also be swaps," *id.* at 65,971, and confirms that "while gambling is traditionally State-regulated, event contracts are traditionally federally regulated," *id.* at 65,973. Indeed, the Exclusion IFR was issued precisely to combat "State-level actions" like Missouri's which "imperil a nascent industry that Congress has entrusted to the 'exclusive jurisdiction' of a federal agency, the CFTC." *Id.* at 65,974.

**H. Missouri Extensively Regulates Gambling and Sports Wagering.**

67. Missouri extensively "regulates sports betting." Ex. 1, Underdog C&D at 1. The Missouri Constitution forbids the General Assembly "[t]o authorize lotteries or gift enterprises for any purpose" except as the Constitution itself provides, Mo. Const. art. III, § 39(9), and the

Criminal Code makes unauthorized gambling a crime, Mo. Rev. Stat. §§ 572.010-.040. Since 2024, sports wagering may be conducted only by licensees of the Gaming Commission, Mo. Const. art. III, § 39(g). The Attorney General has said that "[w]hen it's a bet, it's historically been left to the states to regulate the gambling markets," and that prediction markets that "allow sports betting on their platforms" "should pay the same taxes as any of those other platforms and have the same regulatory structure."[11]

68. In addition to her authority to bring civil suits on the State's behalf, *see supra* ¶ 19, the Attorney General may, "in addition to all criminal sanctions, prosecute a suit in equity to enjoin" as a "public nuisance" any premises "regularly used for any unlawful gambling activity prohibited by" the Criminal Code. Mo. Rev. Stat. § 572.090.1-.2.

69. The Gaming Commission, five members appointed by the Governor with the advice and consent of the Senate, is the state agency that licenses and regulates gaming in Missouri. Mo. Rev. Stat. § 313.004. Under the Missouri Constitution, the Gaming Commission issues the retail and mobile licenses through which sports wagering may be offered, Mo. Const. art. III, § 39(g)(4)-(5), and "shall have the power to adopt and enforce commercially reasonable rules, including emergency rules, to implement" the sports wagering provisions, *id.* § 39(g)(9). The Gaming Commission has adopted such rules, *see* Mo. Code Regs. Ann. tit. 11, ch. 45-20, and "may impose fines upon any person holding, or required to hold, a license or approval under" the sports wagering provisions "or the rules subsequently adopted," of up to $50,000 per violation, Mo. Const. art. III, § 39(g)(9)(k).

---

[11] Ty Albright, *Hanaway says prediction markets should pay up in Missouri*, Newstalk KZRG (Sept. 1, 2026), https://www.newstalkkzrg.com/2026/09/01/hanaway-says-prediction-markets-should-pay-up-in-missouri/ (statements of Defendant Hanaway).

70. In November 2024, Missouri voters amended the Missouri Constitution to authorize sports wagering. Mo. Const. art. III, § 39(g). The amendment defines "sports wagering" as "wagering on professional or collegiate athletic, sporting, and other competitive events and awards involving human participants including, but not limited to, esports, or any other events as approved by the Commission," including "bets or wagers made on . . . portions of athletic and sporting events or on the individual statistics of professional or collegiate athletes." *Id.* § 39(g)(16)(k). Under the amendment, "any entity licensed by the Commission . . . may offer sports wagering . . . through an online sports wagering platform to individuals physically located in this state," at excursion gambling boats, or within a professional sports team's sports district. *Id.* § 39(g)(2)(a). The Gaming Commission may issue retail and mobile licenses only to licensed excursion gambling boats, professional sports teams, and sports wagering operators acting on their behalf, and "not more than two mobile licenses . . . directly to qualified applicants that are sports wagering operators." *Id.* § 39(g)(4)(c). Each licensee pays a wagering tax of 10% of its adjusted gross revenue. *Id.* § 39(g)(10)(a). Licensed sports wagering began in Missouri on December 1, 2025.[12] All the direct licenses are currently taken.

71. Every wager offered by a licensee "must be initiated, made, or otherwise placed by a bettor while physically present within this state," which licensees must enforce with "commercially reasonable geolocation and geofencing technology." *Id.* § 39(g)(12).

72. Missouri also criminalizes unlawful gambling. Missouri's Criminal Code provides that a person "engages in gambling when he or she stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in

---

[12] Mo. Gaming Comm'n, *Missouri Gaming Commission Announces Official Launch of Sports Wagering* (Dec. 1, 2025), https://www.mgc.dps.mo.gov/SportsWagering/Sports_Wagering_Launch122025.pdf.

the event of a certain outcome," and that gambling is "unlawful" when it is "not specifically authorized by law." Mo. Rev. Stat. § 572.010(4), (13). "Bookmaking" is "advancing gambling activity by unlawfully accepting bets from members of the public as a business . . . upon the outcomes of future contingent events." *Id.* § 572.010(2). A person who "knowingly advances or profits from unlawful gambling" commits promoting gambling in the second degree, a class A misdemeanor, *id.* § 572.040, and a person who does so by "[e]ngaging in bookmaking to the extent that he or she receives or accepts in any one day more than one bet and a total of more than one hundred dollars in bets" commits promoting gambling in the first degree, a class E felony, *id.* § 572.030.1(2), .2. Gambling itself is a class C misdemeanor, and a class A misdemeanor if committed by a "professional player." *Id.* § 572.020.2. The Criminal Code excludes from "gambling . . . bona fide business transactions valid under the law of contracts, including but not limited to contracts for the purchase or sale at a future date of securities or commodities," contracts of indemnity and insurance, certain amusement devices, and licensed riverboat gaming. *Id.* § 572.010(4).

**I. Defendants Have Threatened To Apply and Enforce Missouri Law Against CFTC-Regulated Prediction Markets—Including Underdog—For Offering Event Contracts in Missouri.**

73. On September 17, 2026, the Attorney General announced that she was issuing cease-and-desist letters to prediction market companies operating in Missouri, including Underdog. September 17 Report. She stated that "[t]he way that [prediction market companies] take contracts, as what they would call them, I call them bets online on sporting events is just like how FanDuel and others do it," which "fits four square the definition of gambling in Missouri." *Id.* (statements of Defendant Hanaway). The Attorney General added that the platforms "siphon[] a lot of money from a lot of the other sports betting sites that have to pay tax in Missouri," that her

office's goal is to bring them under Missouri's gaming laws and wagering tax, and that, if they do not agree, her office will pursue litigation. *Id.*

74. That same day, the Attorney General sent a cease-and-desist letter, addressed to Underdog's affiliate Underdog Sports Wagering, LLC, concerning the event contracts Underdog offers through its platform. Ex. 1, Underdog C&D. The letter asserts that Underdog "is offering sports wagering to individuals located in the State of Missouri, despite not submitting to regulation by the Missouri Gaming Commission as required by Missouri law," that "entities like Underdog . . . have been required to obtain a license from the Missouri Gaming Commission," and that "by offering sports wagering in Missouri without a license, Underdog has been—and continues to be—in violation of Missouri law." Ex. 1, Underdog C&D at 1. It further demands that Underdog either "cease and desist from such activity" or "obtain a license from the Missouri Gaming Commission," which would require Underdog to "pay all associated state taxes and fees." The letter warns that "[i]f Underdog persists in violating Missouri law, the State of Missouri will pursue available enforcement actions against Underdog," *id.* at 1, and gives Underdog thirty days to confirm compliance or cessation, "[o]therwise, the State of Missouri will take legal action against Underdog," *id.* at 3. The Attorney General subsequently extended the compliance or cessation deadline the Underdog C&D demanded from October 17, 2026, to October 30, 2026. *See* Ex. 2, Underdog Extension Letter. On November 6, 2026, the Attorney General's office notified Underdog that the State intends to commence enforcement proceedings against Underdog within three days.

75. In addition to Underdog, the Attorney General also issued cease-and-desist letters to Polymarket, Kalshi, OG, Novig, and Robinhood. September 17 Report. According to the

Attorney General, the recipients of these cease-and-desist letters constitute "every prediction market company operating in Missouri." *Id.*

76. Defendants' position is clear. The Attorney General acknowledges that Underdog "claims it offers 'event contracts'—or so-called 'swaps'—governed by the Commodity Exchange Act (CEA) and subject to exclusive regulation by the Commodity Futures Trading Commission," but erroneously asserts that "online sports wagering platforms like the one offered by Underdog are subject to state gambling laws, both because the CEA does not preempt state law in this area and because sports betting 'event contracts' do not qualify as 'swaps' under the CEA." Ex. 1, Underdog C&D at 2.

### J. The CFTC Has Made Clear That Compliance With Missouri's Demands Violates The CEA's Core Principles.

77. As required by the CEA, the CFTC has adopted regulations setting out the "Core Principles," which DCMs must follow. One such regulation, Core Principle 2, requires DCMs to offer "impartial access" to their markets and services to users across the country. *See* 17 C.F.R. § 38.151(b). The CFTC has explained that a patchwork of differing state regulations would undermine this obligation—not to mention the purpose of the CEA—"because a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide." Complaint ¶ 78, *United States & CFTC v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026), ECF No. 1. It also emphasized that states' "attempt to regulate and seek civil injunctions and penalties against DCMs and FCMs," like Underdog, "directly violate[s] and undermine[s] the CFTC's regulation requiring 'impartial access' to all eligible participants nationwide." *Id.* ¶ 66-67 (citing 17 C.F.R. § 38.151(b)). The same is true of Missouri's regime, under which a licensee may offer sports wagering online only "to individuals physically located in this state," every wager "must be initiated, made, or otherwise placed by a bettor while physically present within this state," and

every online operator must "use commercially reasonable geolocation and geofencing technology to ensure that it accepts bets only from customers who, at the time of placing the bet, are physically present in this state." Mo. Const. art. III, § 39(g)(2)(a), (12).

78. The CFTC has made clear that compliance with state enforcement actions would violate the Core Principles, bringing DCMs out of compliance with their obligations under the CEA. For instance, on August 11, 2026, the CFTC issued an emergency order directing Kalshi and its affiliates to continue to perform its functions as an exchange in response to New York's ongoing enforcement action against Kalshi.[13] The CFTC stated that compliance with New York's proposed TRO, if granted, would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" *Id.* at 8-9 (citing 7 U.S.C. § 7(d)(4), (d)(9)).

79. Similarly, on July 14, 2026, in response to a state court decision ordering Kalshi to "void[], cancel[], and refund[]" trades entered into by Kalshi traders located in Michigan, the CFTC issued an Order directing Kalshi to "fulfill the open trades in question as it would in the ordinary course of business."[14] The CFTC found that the Michigan court's "unprecedented order" constitutes a "'major market disturbance which prevents the market from accurately reflecting the forces of supply and demand' with respect to event contracts" and that "forced liquidation of trades

---

[13] Order Directing Kalshi to Continue Exercising DCM Functions at 9, *In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration*, CFTC (Aug. 11, 2026), https://www.cftc.gov/media/14471/OGC_MarketEmergencyDeclarationOrder081126/download (hereinafter "New York CFTC Order").

[14] CFTC Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents, In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration and Emergency Rule Filing Pursuant to Commission Regulation 40.6(a), CFTC (July 14, 2026), https://www.cftc.gov/filings/documents/2026/orgcftcorderstayingkalem61407.pdf (hereinafter "Michigan CFTC Order").

will cause distortions" which "would, among other things, violate CEA Core Principle 4, which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." Michigan CFTC Order at 6-8.

80. If there was any doubt whether these directives would apply to Underdog in Missouri and nationwide, the CFTC has now confirmed that they would. On November 5, 2026, the CFTC issued a formal interpretation of the impartial access requirement pursuant to Core Principle 2 of the CEA.[15] The interpretive guidance makes clear that restricting access to certain event contract markets based on prospective traders' location or residence violate the CEA. *Id.* at 4-6. As such, DCMs like the one Underdog operates have been ordered to "cease domestic geographic restrictions that violate the Impartial Access Requirements within 30 days." *Id.*

### K. Defendants' Anticipated Enforcement Against Underdog Will Irreparably Harm Underdog and Preclude Its Ability to Comply With Federal Regulations.

81. The threat of enforcement against Underdog is real, imminent, and concrete. Indeed, the Attorney General has made explicit that "the *only* immediate solutions available to Underdog are to bring its operations into compliance with Missouri law or to stop offering its . . . platform to individuals located in the State of Missouri" because, "[o]therwise, the State of Missouri will take legal action against Underdog." Ex. 1, Underdog C&D at 1, 3 (emphasis added). And on November 6, 2026, the Attorney General's office notified Underdog that the State intends to commence enforcement proceedings within three days. *See supra* ¶ 74. Thus there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject Underdog and its customers to irreparable harm. *See Morales*, 504 U.S. at 381 (no adequate remedy at law where attorneys general had "made clear" they would

---

[15] *Impartial Access Interpretive Guidance*, 17 CFR Part 38, Release Number 9323-26 (CFTC Nov. 5, 2026) https://www.cftc.gov/PressRoom/PressReleases/9323-26 (hereinafter "Impartial Access Interpretation").

seek to enforce state law and thus "enforcement actions [were] imminent"). The prospect of an imminent enforcement action leaves Underdog with a "Hobson's choice" wherein both its options are certain to cause irreparable harm: either Underdog can "suffer the injury of obeying [Missouri's] law" despite the fact that it is preempted, or it can continue to operate in Missouri, "expos[ing] [itself] to potentially huge liability." *Id.*

82. If Underdog complies with Missouri's wrongful assertion of its authority over DCMs by ceasing to offer event contracts in Missouri, it will violate the CFTC's Core Principles, bringing Underdog out of compliance with its obligations under the CEA. *See supra* § J. Indeed, in response to New York's enforcement action against Kalshi, the CFTC stated that New York's proposed temporary restraining order would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" New York CFTC Order at 8-9 (citing 7 U.S.C. § 7(d)(4), (d)(9)). Similarly, in response to Kalshi's notification that it planned to liquidate open derivative positions to comply with a state court order in Michigan, the CFTC stated that such a plan would "violate CEA Core Principle 4." Michigan CFTC Order at 8.

83. Compliance with Missouri's demands would also be extremely costly and would cause reputational and competitive injury, particularly damaging to such a new DCM fighting for market share. Any economic losses Underdog incurs from ceasing operations would be unrecoverable because sovereign immunity bars recovery for monetary damages, causing Underdog irreparable harm. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999); *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887, 899 (8th Cir. 2000) (the "importance of preliminary injunctive relief

is heightened" where "[r]elief in the form of money damages could well be barred by [the State's] sovereign immunity"); *Baker Elec. Coop. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (economic harm irreparable where the plaintiff "would be unable to recover any damages" because the state agency has "sovereign immunity in federal court in suits requesting money damages"); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per curiam) (although "the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped'" (citation omitted)); *see also Bank One, Utah v. Guttau,* 190 F.3d 844, 851 (8th Cir. 1999) ("continued enforcement" of a state statute preempted by federal law "would result in irreparable economic loss" to the regulated party). Injury to Underdog's reputation and goodwill is likewise irreparable. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."); *Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 789-90 (8th Cir. 2010) (loss of goodwill from operating under an unlawful ordinance irreparable where lost customers "would be unlikely to return once the Ordinance's restrictions are lifted").

84. Further, even adherence to Missouri's sports wagering license requirements would not be sufficient to prevent irreparable harm. As a federally regulated DCM and FCM, applying for a state license would require Underdog to ignore the law—which mandates that Underdog obtain federal, not state, approval to operate—and abandon the federal rights it has obtained through its successful application to the CFTC for designation. Moreover, although the Attorney General's letter demands that Underdog "obtain a license from the Missouri Gaming Commission," Ex. 1, Underdog C&D at 1, no Missouri license is available to Underdog. The Missouri Constitution allows the Gaming Commission to issue mobile licenses only to licensed excursion gambling boats, professional sports teams, and sports wagering operators acting on their

behalf, plus two direct licenses to sports wagering operators, Mo. Const. art. III, § 39(g)(4)(b)-(c), and the Gaming Commission has already awarded both direct licenses and acknowledged that it "is only able to grant two licenses." *See supra* ¶¶ 69-70. And even if a license were available, Missouri would require Underdog to accept wagers only from persons "physically present within this state," Mo. Const. art. III, § 39(g)(12), depriving its markets of the nationwide liquidity on which they depend and violating the CEA's requirement that a DCM provide "impartial access" to all eligible participants. *See* 17 C.F.R. § 38.151(b); Impartial Access Interpretation at 4-6.

85. If Underdog refuses to acquiesce to Missouri's demands, it will almost certainly become subject to enforcement efforts, as demonstrated by the Attorney General's cease-and-desist letter to Underdog and her letters to other DCM and FCM operators, Defendants' roles in enforcing Missouri's gambling laws, and the Attorney General's statements that her office will pursue litigation if prediction markets do not submit to Missouri's gaming laws. Ex. 1, Underdog C&D at 1, 3; September 17 Report; see *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("Past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974))).

86. Under the Attorney General's theory whereby Underdog is "offering sports wagering in Missouri without a license," *id.*, the penalties for Underdog's non-compliance with an inapplicable state regulatory regime will be significant, and may be both criminal and civil. Promoting gambling in the first degree—which, on Defendants' theory, any operator that accepts more than one hundred dollars in "bets" in a day commits, *see supr*a ¶ 72—is a class E felony punishable by up to four years' imprisonment and a fine of up to $10,000 for an individual, or up to $20,000 or "double the amount of the corporation's gain from the commission of the offense" for a corporation. Mo. Rev. Stat. §§ 572.030, 558.011.1(5), 558.002.1-.2. Promoting gambling in

the second degree is a class A misdemeanor punishable by up to one year's imprisonment and a fine of up to $2,000. *Id.* §§ 572.040, 558.011.1(6), 558.002.1. The Gaming Commission may impose administrative fines of up to $50,000 per violation on any person "required to hold" a sports wagering license, Mo. Const. art. III, § 39(g)(9)(k), and the Attorney General may sue to enjoin unlawful gambling as a public nuisance, Mo. Rev. Stat. § 572.090.2. Because the Attorney General mischaracterizes the event contracts traded on Underdog's platform as "sports wagers placed by individuals located in the State of Missouri," Ex. 1, Underdog C&D at 2, those penalties—applied trade-by-trade to an active exchange—would be ruinous.

87. The relief the Attorney General demands confirms the severity of the threat. The letter states that Underdog will not be permitted to operate in Missouri unless it obtains a Gaming Commission license and pays the State's taxes and fees, and that Underdog must otherwise "stop offering its online sports wagering platform to individuals located in the State of Missouri." Ex. 1, Underdog C&D at 2-3. An order requiring Underdog to stop offering event contracts to Missouri residents would force Underdog to unwind or refuse to settle open positions in violation of the CEA's Core Principles. *See supra* § J. As the CFTC found in the analogous context of New York's enforcement action against Kalshi, such an assertion of state authority "cuts at the very heart of the Commission's jurisdiction and would have significant adverse ramifications for national and international financial markets," New York CFTC Order at 5, and permitting it to proceed would mean "a single State will effectively become the nationwide regulator of event-contract swaps on DCMs" and "threaten[] to unsettle derivatives markets generally." *Id.* at 5, 9.

88. Accordingly, Underdog has no plain, speedy, or adequate remedy at law to address the wrongs described herein and thus seeks injunctive and declaratory relief.

## COUNT I

**(Express Preemption – Against All Defendants)**

89. Plaintiffs incorporate all prior paragraphs by reference.

90. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

91. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly reserved exclusive authority to the federal government.

92. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Missouri law, and without regard to whether Defendants have correctly interpreted Missouri law, Missouri law is preempted pursuant to the Supremacy Clause. Congress has expressly reserved exclusive authority over trading on federally regulated derivatives markets by giving the CFTC "exclusive jurisdiction" to regulate derivatives trading on approved exchanges and thus to determine whether trading in particular event contracts is permitted. 7 U.S.C. § 2(a)(1)(A). Granting exclusive jurisdiction to the CFTC aligned with Congress' intent in enacting the CEA, which focused on establishing a unified approach to derivatives regulation and preventing patchwork state regulation, which Congress believed would lead to "total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

93. Courts nationwide have agreed that Congress intended to preempt state law in derivatives trading on CFTC-regulated exchanges. *See, e.g.*, *Flaherty*, 172 F.4th at 228; *Coinbase Fin. Mkts., Inc. v. Raoul*, Nos. 25-cv-15406, 26-cv-03659, 26-cv-07363, 2026 WL 2969682 (N.D.

Ill. Oct. 2, 2026); *United States & CFTC v. Minnesota*, No. 26-cv-2661, 2026 WL 2150211, at *13 (D. Minn. July 27, 2026); Order at 2-3, *KalshiEX, LLC v. Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 10, 2026), ECF No. 65; *Thrifty Oil Co.*, 322 F.3d at 1055-57; *Am. Agric. Movement*, 977 F.2d at 1156; *Rasmussen*, 608 F.2d at 178; *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

94. To the extent that Missouri is attempting to enforce its laws—including Mo. Const. art. III, § 39(g); Mo. Rev. Stat. §§ 572.010, 572.020, 572.030, 572.040, and 572.090; and any regulations adopted thereunder, including Mo. Code Regs. Ann. tit. 11, ch. 45-20 (collectively, the "challenged provisions")—against federally regulated derivatives markets, Missouri's enforcement is preempted. By threatening to enforce those or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

95. Therefore, Defendants may not enforce Missouri's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## **COUNT II**

### **(Field Preemption – Against All Defendants)**

96. Plaintiffs incorporate all prior paragraphs by reference.

97. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has adopted a comprehensive regulatory scheme, thus occupying the field for regulation.

98. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Missouri law, and without regard to whether Defendants have correctly interpreted Missouri law, Missouri law is preempted pursuant to the Supremacy Clause.

99. As courts have recognized, "the CEA is recognized as establishing 'a comprehensive system for regulating futures contracts and options'" that grants the CFTC exclusive jurisdiction. *See, e.g.*, *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1194-95 (D. Colo. 2007) (quoting *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993)). That system includes creating the CFTC and vesting it with exclusive authority to regulate derivatives trading, including event contracts. *See* 7 U.S.C. §§ 1 *et seq.*

100. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that leaves no room for parallel state regulation over which event contracts can be restricted.

101. Because federal law occupies the entire field of regulating derivatives trading on regulated markets, enforcement of Missouri's laws against federally regulated derivatives markets is field-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 229-30. Accordingly, by threatening to enforce the statutes referenced at ¶ 94 or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

102. Therefore, Defendants may not enforce Missouri's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

**COUNT III**

**(Conflict Preemption – Against All Defendants)**

103. Plaintiffs incorporate all prior paragraphs by reference.

104. The Supremacy Clause mandates that federal law preempts state law where compliance with the state law would conflict with federal law.

105. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Missouri law, and without regard to whether Defendants have correctly interpreted Missouri law, Missouri law is preempted pursuant to the Supremacy Clause.

106. Defendants' attempts to ban and/or regulate event contracts that federal law and the CFTC have authorized plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. For that reason among others, the threatened actions are conflict-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 229-30.

107. By threatening to enforce the statutes referenced in ¶ 94 or any other statutes, and any rules adopted thereunder, against Underdog, Defendants are violating the Supremacy Clause by intruding upon the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

108. Therefore, Defendants may not enforce Missouri's gaming laws against Underdog because Underdog is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## PRAYER FOR RELIEF

An actual controversy exists between Underdog and Defendants regarding whether Defendants have legal authority to regulate the trading of event contracts not licensed by the Missouri Gaming Commission.

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. Enter a declaratory judgment under 28 U.S.C. §§ 2201-2202 stating that the challenged provisions, or any other state laws pertaining to gambling or wagering, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets, violate the Supremacy Clause and are therefore preempted and unconstitutional;

2. Issue a permanent injunction enjoining Defendants, their officers, employees, successors, and agents, from enforcing the challenged provisions or any other state laws pertaining to gambling or wagering, as applied to Underdog's designated contract market and its involvement in transactions on designated contract markets;

3. Award any other relief within this Court's discretion that it deems just and proper.

Dated: November 8, 2026

/s/ Edward D. Greim
Edward D. Greim (Mo. Bar No. 54034)
GRAVES GARRETT GREIM LLC
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-4144
Facsimile: (816) 817-0863
EDGreim@gravesgarrett.com

Robert A. Fumerton
(*pro hac vice* forthcoming)
David Meister
(*pro hac vice* forthcoming)
Judith A. Flumenbaum
(*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
robert.fumerton@skadden.com
david.meister@skadden.com
judy.flumenbaum@skadden.com

*Attorneys for Plaintiffs Underdog Exchange DCM, Inc. and UDM, LLC d/b/a Underdog Predict*